UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **HOFFMANN-LA ROCHE**, **INC.,** | **Civil Action No. 09-6335 (WJM)** |
| **Plaintiff**, | |
| **v.** | |
| **ROXANE LABORATORIES, INC.,** | **OPINION** |
| **Defendant.** | |

**FALK, U.S.M.J.**

Before the Court is Defendant's motion to compel the production of documents Plaintiff claims are privileged.  [CM/ECF No.  49.]  The motion is opposed.  No oral argument was heard.  Fed. R. Civ. P. 78(b).  Based upon the following, Defendant's motion is **granted**.

## INTRODUCTION

This is a Hatch-Waxman patent case.  Plaintiff, Hoffmann-La Roche, Inc. ("Roche"), is alleged to own United States Patent No. 5,472,949 ("the '949 patent").  The '949 patent covers the drug capecitabine, which is used to treat breast and colon cancer.  Roche manufactures its capecitabine drug under the trade name Xeloda®.  Defendant Roxane Laboratories, Inc. ("Roxane") filed an Abbreviated New Drug Application with the FDA to market and sell a generic version of Xeloda®.

The  issue  to  be  decided  is  whether  twenty-one  (21)  documents  ("the  Disputed

Documents") are protected by the attorney-client privilege.  The Disputed Documents are owned and were produced in this case by a non-party, Chugai Pharmaceuticals, Inc. ("Chugai"), who has *never* claimed they are privileged.  Nevertheless, Roche has opposed their production on attorney-client privilege grounds.  Roxane has objected to Roche's standing to assert the privilege, and has also sought production of the documents under various theories, including that they do not qualify as privileged communications, and that any privilege has been waived.

This Court holds that Roche lacks standing to assert attorney-client privilege over the Disputed Documents; that Roche has failed to establish that certain of the Disputed Documents are privileged; and that, whatever privilege may have existed has been waived.

## BACKGROUND

### A.  The Relevant Parties

Capecitabine was allegedly discovered in the early 1990s by scientists employed by Nippon Roche K.K., a Japanese company ("Nippon Roche").  At that time, Nippon Roche was a wholly owned subsidiary of a large Swiss conglomerate, Roche Holding Ltd.  ("Roche Holding").  (Pl's Br. 3; Declaration of Irene E. Hudson, Esq. ("Hudson Decl.") Ex. 5.)  The plaintiff in this case, Hoffmann La-Roche, Inc., is a New Jersey company that is also a wholly owned subsidiary of Roche Holding.  (Id.)  A third subsidiary under Roche Holding's umbrella is F. Hoffmann-La Roche, Ltd., a Swiss company ("Roche Basel").  The application for the '949 patent apparently came to be through a collaboration between the three then-

subsidiaries of Roche Holding; *i.e.*, Plaintiff Roche, Roche Basel, and Nippon Roche.

In 2001, Nippon Roche merged with another Japanese company, Chugai, in a transaction described as an "alliance." (Declaration of Darryl H. Steensma, Esq., ("Steensma Decl.") Ex. 2.) Following the merger, Nippon Roche ceased to exist, and Chugai became the sole surviving entity. Chugai is *not* wholly owned by Roche Holding or any other Roche entity, although an additional Roche Holding subsidiary does own a percentage of the company. (Hudson Decl., Ex. 5.)

**B.**     <u>**History of the Disputed Documents**</u>

The Disputed Documents have been the subject of prior proceedings before this Court, and some procedural history helps place the motion in context.

The 21 Disputed Documents belong to Chugai, the non-party entity that survived the merger with Nippon Roche. Since the merger in 2001, the documents have been stored in Chugai's facilities in Japan. (Steensma Decl., Ex. 3 at 6.) Indeed, in discovery, Roche has repeatedly emphasized that the companies are separate, and that Chugai's documents and are not within Roche's control. (<u>See</u> Steensma Decl., Ex. 4 ("Plaintiff Hoffmann La-Roche Inc. has zero ownership interest in Chugai, and therefore, cannot compel Chugai to produce documents."); <u>id</u>, Ex. 5 ("*Plaintiff Hoffmann La Roche, Inc.* restates that it has no ownership interest in Chugai and *cannot compel Chugai to produce <u>its</u> documents*." (emphases added)); <u>id.,</u> Ex. 7 ("Roche has no control over the named inventors . . . and, therefore, Roche cannot compel the inventors to appear for deposition.").)

Substantively, the Disputed Documents were all created between 1992 and 1995. Roche claims they relate to the preparation and prosecution of the '949 patent application filed with the United States Patent and Trademark Office (USPTO). Roche contends that the "attorney," for purposes of applying the attorney-client privilege to these documents, is Robert A. Silverman, Esq., an in-house patent attorney at Roche.

In June 2010, Chugai voluntarily produced the Disputed Documents in discovery in this case. They were provided to Roche as an intermediary, who accepted the documents and transferred them, *en masse* and without a privilege review, to Roxane. (See Steensma Decl., Ex. 8; Def.'s Br. 4.) Prior to production, Chugai alone collected the documents; Roche played no role, did not review the documents, and did not claim any were privileged before delivering them to Roxane. (Id.) Thus, beginning in June 2010, Roxane had unfettered access to the Disputed Documents.

On September 20, 2010, Teva Pharmaceuticals, Inc., a defendant in another capecitabine ANDA case that has been consolidated with this one for discovery purposes, Roche v. Teva, 09-5283 (WJM), noticed that certain documents, the eventual Disputed Documents, appeared on a privilege log provided to Teva but had in fact been produced to Roxane. (Def.'s Br. 4; Steensma Decl., Ex. 9.) Teva notified Roche of the discrepancy, but Roche did not contact Roxane nor did it seek a return of the documents at that time. (Def.'s Br. 4.)

On November 23, 2010, five months after the Disputed Documents were produced to

Roxane and two months after the discrepancy was raised by Teva, Roche sent correspondence to Roxane asking whether certain allegedly privileged documents had been included in the Chugai production.  (Steensma Decl., Ex. 12.)  Roche's letter was not specific and conveyed that it was unsure what documents had even been produced; indeed, Roche simply provided Roxane with a log of approximately 100 documents and asked it to determine precisely what documents on that list had been received, and to return or destroy any that were produced pursuant to a provision contained in the Discovery Confidentiality Order entered in this case.  (Id.)

On December 30, 2010, Roxane filed a letter and exhibits totaling 120 pages, seeking an order permitting use of the allegedly privileged Disputed Documents and challenging Roche's ability to claim privilege over non-party Chugai's documents.  (Steensma Decl., Ex. 13; CM/ECF No. 34.)

Roche responded on January 20, 2011, stating that it had withdrawn its privilege claims as to approximately 80 of the 100 documents.  Roche also provided a new and amplified privilege log that included, for the first time, a U.S. licensed attorney, Robert Silverman, Esq., as an author or recipient of various communications.  Based on the new privilege log, Roche continued to maintain its privilege claim over the 21 Disputed Documents.  (Steensma Decl., Ex. 6.)

Roxane submitted a second 100 page submission on January 31, 2011, objecting to the new privilege log and continuing to claim that Roche lacked standing to assert privilege, that

the documents were not privileged at all, and that any privilege had been waived.  (Steensma

Decl., Ex. 14; CM/ECF No. 41.)

The next day, February 1, 2011, the Court held a conference in an effort to resolve the

dispute.[1]  This Court questioned whether Roche had standing to assert the privilege, given its

continued insistence that it had no control over the documents, and also opined that it seemed

doubtful that the documents, based on the descriptions in the privilege logs, would ultimately

be held protected.  (See Tr. at 18:22-19:17.)    However, in light of the inconsistent,

complicated and prolix letter submissions, the Court denied Roxane's application without

prejudice to renewing the request in a formal way.[2]  The Court also temporarily enforced the

"claw-back" provision in the Discovery Confidentiality Order, effectively taking the

Disputed Documents out of Roxane's control, solely to preclude use of the Disputed

Documents in Japan.  (Tr. at 18:11-21.)

---

[1]  Despite receiving the 100 page submission addressing new arguments and a new privilege
log the night before, the Court proceeded with the conference because the parties were
preparing to travel to Japan for depositions, and the Court was attempting to help resolve this
and other discovery disputes, including requests to compel the attendance of witnesses in
Japan.  (See Transcript of February 1, 2011 Telephone Conference ("Tr.") 7:9-14; 8:2-16;
21:4-8 ("[W]e have to have some common sense and reasonableness. . . ."); 21:22-25 ("I'm
really sort of reaching out to you folks and urging that you reconsider your positions and
decide what's important and decide what you want to litigate.")).

[2]  See Tr. 20:3-5 ("[Y]ou have not given this to me in a way – you wanted me to decide this
quickly before your trip to Japan.  And you have not given it to me in a way that I can do
that."); Tr. 20:6-12 ("If you want to raise the privilege issue with me, then what I want you to
do is I want to get one privilege log that we can work from . . . Two, you can file briefs,
which will be in the form of a regular brief, not these single spaced letters; double-spaced
briefs with page limitations.  [And] [t]he documents will be submitted for *in camera*

On March 8, 2011, Roxane filed a formal brief supported by a dense appendix renewing its request for formal production of the Disputed Documents.  Roche responded on March 25, 2011, with a brief, as well as declaration prepared by renowned, retained expert Professor of Law Stephen A. Saltzburg.[3]  On May 4, 2011, the Disputed Documents were submitted for *in camera* review.

## DISCUSSION

Roxane advances a panoply of arguments as to why the Disputed Documents should be produced: (1) Roche lacks standing to assert privilege over Chugai's documents; (2) Roche waived any privilege when the documents where left in Chugai's control following the merger in 2001; (3) Chugai waived any privilege it may have had over the documents by producing them to Roche and/or Roxane; (4) Roche has not established that the actual documents are privileged communications; (5) Roche waived any privilege through their tardy and ineffective attempts to rectify the inadvertent disclosure to Roxane; (6) Roche waived any privilege that could attach during Mr. Silverman's deposition; and (7) the crime-fraud exception to the attorney client privilege.

---

review."); see also Order dated February 2, 2011; CM/ECF No. 44.

[3] Roxane has filed a brief seeking to strike the Saltzburg Declaration for containing improper expert testimony regarding the governing law and offering legal opinions and conclusions. [CM/ECF No. 64.]  The declaration is probably improper because it is largely comprised of statements of governing law and legal conclusions.  Much of what is contained there could have (and perhaps should have) been included in a brief.  Thus, it would be within the Court's discretion to strike the declaration.  See, e.g., United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991).  Nevertheless, the Court declines to strike the declaration at this time, as it is

A.   <u>**Attorney-Client Privilege**</u>

The attorney-client privilege is the client's right to refuse to disclose "confidential communications between attorney and client made for the purpose of obtaining legal advice." <u>Genetech, Inc. v. U.S. Int'l Trade Comm'n</u>, 122 F.3d 1409, 1415 (Fed. Cir. 1997).  It exists to promote the public interest in "the observance of law and the administration of justice," <u>Westinghouse Elec. Corp. v. Republic of the Philippines</u>, 951 F.2d 1414, 1423 (3d Cir. 1991), which is accomplished by encouraging "full and frank communications between attorneys and their clients."  <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 389 (1981).  The privilege is an exception to the rule of full disclosure and obstructs the truth finding process, thus it is narrowly construed.  <u>See</u> <u>Westinghouse Elec. Corp.</u>, 951 F.2d at 1423.  It protects only those communications that would not have been made but for the privilege.  <u>See</u> <u>Fisher v. United States</u>, 425 U.S. 391, 403 (1976); <u>Shearing v. Iolab Corp.</u>, 975 F.2d 1541, 1546 (Fed. Cir. 1992).  It belongs to the client, not the attorney.  <u>American Standard, Inc. v. Pfizer</u>, 828 F.2d 734, 745 (Fed. Cir. 1987).  Application of the privilege is decided on a case-by-case basis with the party asserting privilege bearing the burden to show it applies.  <u>See</u> <u>In re Bevill, Bressler & Schulman Asset Mgmt. Corp.</u>, 805 F.2d 120, 124 (3d Cir. 1986).  In determining whether the privilege applies in a given case, the ultimate question is whether a "communication is one . . . made. . . for the purpose of obtaining legal advice or services."  <u>In</u>

---

ultimately beside the point, <u>see</u> footnote 7, *infra*.

8

re Spalding Sports Worldwide, Inc., 203 F.3d 800, 805 (Fed. Cir. 2000).[4]

**B.**   **Analysis**

**1.**   **Roche Lacks Standing to Assert the Privilege**

Roxane contends that Roche has repeatedly maintained that the disputed documents are Chugai's, that it could not produce the documents, and that Chugai is a separate company that is not under its control.  (Def.'s Br. 6-7.)  Thus, Roxane claims that it is impossible and inequitable for Roche to now claim that it nevertheless possesses the right to assert a personal privilege over the same documents.  (Id.)  In addition, Roxane argues that Roche has failed to establish a common interest, or community of interest, with Chugai.  (Id.)

It is true that during the course of this litigation, Roche has repeatedly and expressly taken the position that it and Chugai are different companies, and that Chugai's documents are not in their control:

- "Plaintiff Hoffmann-La Roche, Inc. has zero ownership interest in Chugai, and therefore, cannot compel Chugai to produce documents." (Steensma Decl., Ex. 4);
- "Plaintiff Hoffmann-La Roche, Inc. restates that it has no ownership interest in Chugai and cannot compel Chugai to produce *its* documents." (Steensma Decl., Ex. 5) (emphasis added);
- "Roche has no control over the named inventors . . . and, therefore, Roche cannot compel them to appear for deposition."  (Steensma Decl., Ex. 7).

---

[4] The parties have not briefed choice of law in this patent case.  In general, in patent cases, regional circuit law applies "to questions of attorney-client privilege and waiver of attorney-client privilege." Fort James Corp. v. Solo Cup Co., 412 F.3d 1340, 1346 (Fed. Cir. 2005); In re Resmed, Ltd., 106 F.3d 424 (Fed. Cir. 1996) (table) (applying Third Circuit law). However, Federal Circuit law controls when the dispute implicates substantive issues of patent law.  See In re Spalding, 203 F.3d at 803-04.

It is inconsistent for Roche to forcefully disclaim the ability to produce the very documents at issue in this dispute, but then (after they are voluntarily produced by Chugai) argue that *it* has standing to assert a privilege to prevent their disclosure.[5] Yet, Roche argues it should be permitted to assert privilege for two reasons: (1) the "common-interest doctrine" confers standing on Roche to assert the privilege; and (2) in the corporate context, the "client" for purposes of the attorney-client privilege extends among and between a parent company and all of its affiliates; *i.e.*, here, beyond Chaugi to, apparently, include Roche and all other related Roche entities.  (Pl.'s Br. 19-20.)

The common-interest, or community-of-interest, doctrine allows "*attorneys representing different clients* with similar legal interests to share information without having to disclose it to others."  In re Teleglobe Commc'ns Corp., 493 F.3d 345, 364 (3d Cir. 2007) (emphasis added).  If applicable, the doctrine protects communications "*made between attorneys* when all members of the community share a 'common legal interest' in the shared communication."  Id. at 364 (emphasis added).  The common-interest doctrine is not an independent privilege, but rather, an exception to the general rule that disclosure of a privileged communication to a third-party waives the privilege.  See, e.g., Cavallaro v.

_____

[5] This Court has previously expressed its grievance with the practice in patent litigation of taking shifting and inconsistent approaches to corporate affiliations and relationships when foreign companies and discovery are involved.  See Sanofi-Aventis v. Sandoz, Inc., ---F.R.D.---, 2011 WL 322396, at *6 (D.N.J. Jan. 28, 2011).  Here, Roche has stated that it "cannot compel Chugai to produce *its documents*," Steensma Decl., Ex. 5, but now argues that "[o]wnership of the withheld documents never transferred from Roche to Chugai." (Pl.'s Br. 21.)

United States, 284 F.3d 236, 250 (1st Cir. 2002) ("The common interest doctrine . . . is not an independent basis for privilege, but an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third-party." (quotation omitted)).  The degree of common legal interest required to qualify under the doctrine is the subject of some debate, ranging from "substantially similar" to "identical."  See, e.g., La. Mun. Police Empl. Ret. Sys. v. Sealed Air, 253 F.R.D. 300, 309-10 (D.N.J. 2008) (substantially similar legal interests sufficient); Duplan Corp. v. Deering Milliken, Inc., 397 F. Supp. 1146, 1172 (D.S.C. 1974) (identical interests required).  The burden to show the privilege has not been waived, and thus, that the doctrine applies, rests with the party resisting disclosure.  See Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, LLC, 202 F.R.D. 418, 423 (E.D. Pa. 2001).

The common-interest doctrine does not apply in this case for a very simple reason: there is only a single attorney, Mr. Silverman, alleged to be involved in the Disputed Documents.  The common-interest doctrine only applies to communications *between attorneys*.  In re Teleglobe, 493 F.3d at 364-65; see also Restatement (Third) of the Law Governing Lawyers, § 76 (2000) ("Restatement") ("If two or more clients with a common interest . . . are represented by *separate lawyers* . . ." (emphasis added)).  Thus, in order for the common interest doctrine to apply, there must be, at a minimum, *two attorneys*.  The Third Circuit's opinion in Teleglobe has clearly explained this requirement and why the doctrine does not apply here:

- "First, to be eligible for continued protection, the communication must be shared with the *attorney* of the member of community of interest.  Sharing the communication directly with a member of the community may destroy the privilege," 493 F.3d at 364 (emphasis in original);

- "The attorney sharing requirement helps prevent abuse by ensuring that **the common-interest privilege only supplants the disclosure rule when attorneys, not clients, decide to share information in order to coordinate legal strategies**," id. at 365 (emphasis added);

- "We conclude with two points of caution.  First, **the privilege only applies when clients are represented by separate counsel**.  **Thus, it is largely inapplicable to disputes like this one that revolve around corporate family members' use of common attorneys (namely, centralized in-house counsel)**," id. (emphases added).

Teleglobe ends the inquiry.  Since Roche has never argued that more than one attorney, Mr. Silverman, was involved in any of the communications at issue, the common-interest doctrine does not apply in this case.  See id. at 365, 372.[6]  Thus, Roche's first standing

---

[6] Plaintiff's brief only devotes a paragraph to the common interest argument, leaving the heavy lifting to Professor Saltzburg, who has submitted a declaration in support of Plaintiff's position.  (See Pl.'s Br. 19, citing to Declaration of Stephen A. Saltzburg, Esq. ("Saltzburg Decl.") ¶¶ 12-15.)  While the declaration is certainly comprehensive, learned and scholarly, it is ultimately unhelpful to Plaintiff's case because there is no second attorney to pair with Mr. Silverman, which is necessary in order to properly invoke the common-interest doctrine.  See Teleglobe, 493 F.3d at 365; Restatement § 76.  The declaration's only mention of the fatal absence of a second attorney is a footnote that essentially concludes that Teleglobe is a non-binding opinion and cites to other non-binding opinions that could be read to omit the requirement.  (See Saltzburg Decl., ¶12 n.9.)  While the Court appreciates that it may not be constrained to follow Teleglobe in this federal patent case, the Court certainly is not compelled to follow the other non-binding opinions in the declaration.

Moreover, this Court believes the declaration short-changes Teleglobe by emphasizing it is a Delaware law case and implying it has limited import beyond its facts. While Teleglobe was a case applying Delaware law, its discussion of the common-interest doctrine was not so limited.  The Third Circuit engaged in a contemplative analysis of the purpose, history, and requirements of the common-interest doctrine, without much reference to Delaware law at

argument fails.[7]

Roche's second standing argument is that, in the corporate context, the "client" for purposes of the attorney-client privilege is not only the corporation in suit, but the party's parent corporation, its subsidiaries, and its sister companies. Thus, Roche claims that it is the client for purposes of the attorney-client privilege just as much as Chugai.[8] Back to

---

all. And the opinion has not been narrowly construed by other courts. In fact, Teleglobe has been cited by courts around the country as a leading opinion on the common-interest doctrine. It is not an outlier decision interpreting a finite point of Delaware law. Rather, Teleglobe has been recognized by other courts as a proper statement of the common-interest doctrine's requirements. See, e.g., United States v. Okun, 281 Fed. Appx. 228, 231-32 (4th Cir. 2008) (citing Teleglobe and refusing to apply common interest doctrine when defendant "failed to establish that he and [co-defendant] were represented by separate legal counsel . . ."); Cooper Health Sys. v. Viruta Health, Inc., 259 F.R.D. 208, 214-15 (D.N.J. 2009) (citing Teleglobe and rejecting common interest doctrine when only single attorney was involved). Thus, this Court follows Teleglobe in this case.

[7] As Teleglobe explains, the presence of a single attorney could augur in favor of arguing the separate doctrine of "co-client" or "joint-client" privilege. Roche has not done so here, repeatedly invoking by name *only* the common-interest doctrine. See, e.g., Saltzburg Decl., ¶ 8 ("[The] Disputed Documents qualify as attorney-client privilege because of the common-interest doctrine."); ¶ 11 ("the common-interest doctrine is an exception to the general rule that the attorney-client privilege is waived . . ."); ¶ 12 ("the common-interest doctrine will only apply where . . ."). Teleglobe makes plain the difference between the two doctrines and their requirements, as do other authorities. See, e.g., Restatement § 76 cmt. a ("This section states the common-interest attorney client privilege. The rule differs from the co-client rule. . . ."); see also Munich Reinsurance Am. v. Am. Nat'l, Ins. Co., No. 09-6435, 2011 WL 1466369, at *21 (D.N.J. Apr. 18, 2011) ("The common interest doctrine only applies when clients are represented by separate counsel and is not identical to the co-client situation . . . ." (quotation omitted)). Having failed to argue the joint or co-client doctrine, Roche has not, and cannot, meet its burden of showing that it applies and that its requirements have been met. See In re Bevill, Bressler & Schulman, 805 F.2d at 126.

[8] Parenthetically, this ignores that Roche is essentially taking the position that it is somehow the client, but apparently not a client that can produce what would then be its own documents

Teleglobe.  There, the Third Circuit noted that "[b]ecause parent companies often centralize the provision of legal services to the entire corporate group in one in-house legal department, it is important to consider how the disclosure rule affects the sharing of information among corporate affiliates."  Id. at 369.  In considering various alternatives, the Court specifically *rejected* the position advanced by Roche here, *i.e.*, that varied members of a corporate family are a "single client" for purposes of the privilege:

> [T]reating members of a corporate family as one client fails to respect the corporate form.  It is a bedrock principle of corporate law in Delaware and elsewhere that courts must respect entity separateness unless doing so would work an inordinate equity. . . .[B]y structuring its various activities by forming separate corporations, a parent company realizes numerous benefits, not the least of which are the liability shields.  With that structure comes the responsibility to treat the various corporations as separate entities.

Id. at 371.

Further:

> [A]bsent some compelling reason to disregard entity separateness, in the typical case courts should treat the various members of the corporate group as the separate corporations they are and not as one client.

Id. at 372.

There is no reason to treat Roche and Chugai as one entity for purposes of the attorney client privilege, especially when Roche has been so insistent that they are separate entities. Thus, Roche is not the "client" for purposes of raising the attorney-client privilege associated

_____

or witnesses in discovery, *see* page 10, *supra*.

14

with Chugai's Disputed Documents.

For the above reasons, Roche does not have standing to assert attorney-client privilege over the Disputed Documents. Thus, there is no reason to proceed further. Nevertheless, for the sake of completeness, the Court will proceed and assume, *arguendo*, that Roche has standing. Were that to be the case, the application would still be granted for the following reasons.

## 2.      It is Unclear Whether the Disputed Documents are Privileged

The parties have broken the 21 disputed documents down into two categories. The first 6 documents are described as documents prepared prior to Mr. Silverman's employment. (Def.'s Br. 11.)  Documents 7-21 are described as documents that were created at Mr. Silverman's request or for his benefit in prosecuting the '949 patent. (Pl.'s Br. 12; Def's Br. 12.)  The Court has reviewed the documents *in camera*. As explained below, Disputed Documents 1-6 are not privileged and must be produced. Documents 7-21 appear to be privileged, but, as is discussed in section 3, *infra*, must nevertheless be produced.

Application of the attorney-client privilege is considered on a case-by-case basis. See In re Spalding, 203 F.3d at 805. The burden of establishing privilege is on the party resisting disclosure. See In re Grand Jury Investigation, 599 F.2d 1224, 1235 (3d Cir. 1979); In re Diagnostic Sys. Corp., 328 Fed. Appx. 621, 623 (Fed. Cir. 2008).

In the context of communications involving foreign patent agents or patent professionals, the basic rules follow. If a communication with a foreign patent agent

involves a United States patent application, then the communications are *not* privileged,

unless the patent agent was acting under the direct control and authority of a U.S. licensed

attorney; *i.e.*, the foreign professional was acting as the attorney's agent.  See Bristol Myers

Squibb Co. v. Rhone-Poulenc Rorer, Inc., No. 95-8833, 1998 WL 158958, at *1 (S.D.N.Y.

Apr. 2, 1998).  If, however, the communications involve a foreign patent application, then the

laws of the foreign jurisdiction would apply.  See id.[9]  To qualify as an "agent," the foreign

patent professional would have to qualify under the derivative extension of the attorney-

client privilege endorsed by the Second Circuit in United States v. Kovel, 296 F.2d 918 (2d

Cir. 1961).  See La. Mun. Pol. Ret. Sys., 253 F.R.D. at 311-15 (describing requirements of

*Kovel* doctrine).

### i.   **Disputed Documents 1-6**[10]

The six documents in this category were created in 1992.  They are communications

---

[9]  Roche takes the position that in order for foreign law to apply, a document must relate to matters *soley* involving a foreign entity.  (Pl.'s Br. 11.)  In other words, if the communications are mixed and relate to both United States and foreign patent applications, U.S. law, not foreign law would apply.  There is authority supporting that position.  See Golden Trade, S.R.L. v. Lee Apparel Co., 143 F.R.D. 514 (S.D.N.Y. 1992). However, the law is not uniform, and even cases cited by Roche employ a lesser standard that considers foreign law when a document's reference to a U.S. patent is "incidental." See VLT Corp. v. Unitrode Corp., 194 F.R.D. 8, 15 (D. Mass. 2000) ("If, as the parties appear to agree, a communication has nothing to do with the United States or, in the court's view, only an incidental connection to this country, the privilege issue will be determined by the law of the foreign nation.").  Some of these disputed communications involve both the U.S. and foreign patent applications.  However, no foreign law has been briefed.

[10]  These are: CHUGAI000011961-995; CHUGAI000011930-960; CHUGAI00011865-911; CHUGAI000011843-846; CHUGAI 000011847-862; CHUGAI000011819-841.

between foreign patent professionals reflecting discussion over draft patent applications and claims.  No licensed U.S. attorney authored or received the communications at the time they were made.  Indeed, Mr. Silverman was not hired by Roche until late 1993.  (Steensma Decl., Ex. 21 (Deposition of Robert A. Silverman, Esq. 6/9/10 at 15:8-15).)  Since Mr. Silverman was not employed by Roche at the time the documents were created, Roxane argues the documents must be produced because they could not be communications between an attorney and client, and additionally could not have been undertaken at his direction and under his control.

In response, Roche argues that company protocols related to the filing of patent applications in both Europe and the United States contemplate that certain documents will be created when preparing patent applications, and those documents will, even if not requested by an attorney, ultimately make their way into a patent application filed in the United States or to an in-house attorney for review.  (Pl.'s Br. 7; 10 "[E]ven though a specific request for a draft patent application was not made by a U.S. attorney such as Mr. Silverman, who at the time was not yet employed by [Roche], the Roche standard procedure necessarily takes into account that the [application] . . . would be filed in the USPTO.")  Thus, they contend, there is essentially a universal implied request for legal advice built into their corporate protocols that supports application of the privilege under the Federal Circuit's opinion in In re Spalding.  The Court disagrees.

Draft patent applications and communications associated with those applications are

generally privileged communications, even if technical or other business information is included.  See In re Spalding, 203 F.3d at 805-06; In re Gabapentin Patent Litig., 214 F.R.D. 178, 182 (D.N.J. 2003).  However, in order for those communications to be privileged, there still has to be an *attorney* involved.  See In re Spalding, 203 F.3d at 803 ("the central inquiry is whether the communication is one that was made *by a client to an attorney* for the purpose of obtaining legal advice or services.").  In other words, "[t]o be privileged, *a draft patent application, like any other document, must be a communication between an attorney and a client . . . .*"  In re Rivastigmine Patent Litig., 237 F.R.D. 69, 86 (S.D.N.Y. 2006) (emphasis added).  A basic tenant of the attorney-client privilege is that the communication is made to or from an attorney for purposes of securing legal advice and would not have been made but for the need for such advice.  See Fisher v. United States, 425 U.S. 391, 403 (1976). Documents are not privileged simply because they end up with a lawyer or eventually prove useful to the lawyer's provision of legal services.  See, e.g., 1 Edna Selan Epstein, *The Attorney-Client Privilege and the Work Product Doctrine*, at 126 (5th Ed. 2007) ("Epstein") ("Few abuses of privilege claims are more common that [sic: than] the attempt to invest with privilege documents which, standing alone, are not privileged merely by virtue of the fact that they have been transmitted to an attorney.").

In re Spalding, relied upon by Roche, does not hold differently.  Spalding involved a claim of privilege made by the patentee over an invention record submitted by the inventors of the patent directly to the company's legal department.  See 203 F.3d at 802.  The court

described the invention record at issue as a "standard form[] . . . used . . . as a means for inventors to disclose to the corporation's patent attorneys that an invention has been made and to initiate a patent action." Id. at 802 n.2. Production of the record was granted by the district court based upon arguments that the record was not primarily legal in nature but was also created for business purposes, and that it contained discoverable business and technical information, not solely attorney-client communications. See id. at 803.

The Federal Circuit disagreed. Id. at 802. The court noted that the relevant inquiry was still "whether the communication was made by a *client to an attorney* for the purpose of obtaining legal advice." Id. at 805. It found that the invention record was privileged because it was "a communication to an attorney," that was "submitted by the inventors" to "Spalding's *legal* department," id. (emphasis in original), "for the purpose of securing primarily legal opinion, or legal services, or assistance in a legal proceeding." Id. (quotation omitted). It further held that even if the record contained business or technical information, it would remain protected because the "overall tenor of the document indicates that it is a request for legal advice or services." Id. at 806. Thus, Spalding stands for the basic principle that a communication between a lawyer and client relating to patent prosecution is not ineligible for protection under the attorney-client privilege simply because it contains technical information. Id. Contrary to Roche's argument, Spalding actually *emphasizes* the fact that an attorney must be involved. Id. at 805.

Here, unlike in Spalding, Disputed Documents 1-6 are not communications to or from

an attorney.[11] Nor are they communications made to or among individuals acting under Mr. Silverman's direction or control.  Rather, the documents are simply drafts and communications[12] exchanged between employees of foreign Roche entities without any attorney involved.

Finally, the Court disagrees with Roche's suggestion that there can be some type of standing request for implied legal advice that eliminates the need for an attorney to be involved in a communication.  Such a position finds no support in Spalding, nor does it make practical sense.  If Roche's position was adopted, it essentially would allow Roche to pick and choose, after the fact, what constitute privileged communications, even though no attorney requested or was involved in the communication in the first place.  This cannot be

---

[11] Plaintiff cites Technologies General IP PTE Ltd. v. Elan Microelectronics Corp., No. 2006 WL 3290400 (N.D. Cal. Nov. 13, 2006), to support its argument that that the communications are privileged simply because, at some future date, a final draft patent application would be submitted to in-house counsel. (Pl.'s Br. 10-11.) Technologies General does not eliminate the requirement that an attorney be involved in a given communication, including in draft patent applications.  See In re Rivastigmine Patent Litig., 237 F.R.D. at 86. Moreover, Technologies General simply cites to Advanced Cardiovascular Sys. Inc. v. C.R. Bard, 144 F.R.D. 372, 378 (N.D. Cal. 1992), which stands for the non-controversial premise that "*inventors and their patent lawyers often engage in quite substantial private dialogue as part of the process of shaping and focusing a patent application*." Id. at 378 (emphasis added).  Of course, the private dialogue referred to in Advanced Cardiovascular necessarily requires that *a lawyer* be part of the conversation.  Id. at 378 ("inventors and their patent lawyers often engage in quite substantial private dialogue").  Again, this is missing here.

[12] Of note, these communications seem focused heavily, if not exclusively, on the European application.  The connection to the United States application is secondary at best.  Thus, there is a real question as to whether foreign law could apply.  See VLT Corp. 194 F.R.D. at 15. Roche clearly has not shown the Disputed Documents to be protected under foreign law, as it has not briefed the issue.

squared with the requirement that the privilege protect only those communications that would not have been made but for the existence of the privilege.   See Fisher, 425 U.S. at 403. Thus, Documents 1-6 are not are not privileged.

> **ii.    Documents 7-21**

Documents 7-21 reflect communications between: (1) Mr. Silverman and various employees at Roche Basel and Nippon Roche; and (2) communications between and among employees at the Roche entities.  The communications all involve Mr. Silverman's response to an Office Action taken by the USPTO and his efforts to respond to the Office Action and further prosecute the '949 patent.  Following an *in camera* review, the Court is satisfied that the documents reflect communications involving foreign patent agents operating under the direction and control of a U.S. licensed attorney.  It appears that Mr. Silverman was involved in responding to the Office Action in a substantive way; he was not merely a passive actor. Thus, under the applicable law, these documents would appear to be privileged.  See Bristol Myers Squibb Co., 1998 WL 158958, at *1.

**3.    Any privilege has been waived through the Silverman Deposition**

It is well established that the attorney-client privilege cannot be used as a proverbial sword and shield – to waive when it benefits the client and wield when it does not.  See, e.g., In re Human Tissue Prod. Liability Litg., 255 F.R.D. 151, 158 (D.N.J. 2008); In re Seagate Technology, LLC, 497 F.3d 1360, 1372 (Fed. Cir. 2007).  Thus, courts have found an implied waiver of the attorney-client privilege where a party affirmatively places otherwise

privileged information at issue in the case.  See, e.g., id.; In re Nat'l Smelting of N.J., Inc. Bondholders Litig., No. 84-3199, 1989 U.S. Dist. LEXIS 16962, at *28-34 (D.N.J. June 29, 1989); 1 Edna Selan Epstein, *The Attorney-Client Privilege and the Work Product Doctrine*, at 508 (5th ed. 2007).  Indeed, "disclosure of, or even merely an assertion about, the communication may effect waiver of the privilege not only as to that communication, but also as to other communications made during the same consultation and communications made at other times about the same subject."  United States v. Aronoff, 466 F. Supp. 855, 862 (S.D.N.Y. 1979).  Ultimately, the "at issue" waiver of privilege is grounded in fundamental fairness.  See, e.g., 8 Wigmore, Evidence § 2327 at 636 ("[W]hen [the] conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not.  He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.").  The party resisting disclosure that must show the privilege has not been waived.  See In re Grand Jury Investigation, 599 F.2d at 1233.

Mr. Silverman sat for deposition on February 24, 2011.  (Steensma Decl., Ex. 22.) Roxane contends that he testified at length regarding his communications during the prosecution of the patent application, which is the same subject matter covered in Disputed Documents 7-21.  (Def.'s Br. 18-20.)  It also claimed that he specifically referred to communications with individuals listed on Roche's privilege log about the same subjects in the withheld documents.  Roche tries to explain away Mr. Silverman's deposition testimony by arguing that "to the extent Mr. Silverman testified about allegedly privileged

communications, he testified about them only generally and provided the type of information that would be found on a privilege log." (Pl.'s Br. 24.) The Court does not entirely accept Roche's characterization of Mr. Silverman's testimony.

For instance, Mr. Silverman testified to the substance of his communications with inventors following the USPTO Office Action, stating, "I probably -- I think I was pretty specific, that we wanted to compare data against . . . the most closely analogous compounds in the prior art." (Steensma Decl., Ex. 22 (Silverman Dep. Transcript 2/24/11 ("Silverman Dep.") 95:3-10)). He further testified about why certain information generated by one of the named inventors allegedly was not included in a declaration filed with the PTO: "my recollection was we focused on, after having a discussion back and forth, we focused more on the pharmacokinetic profiles [than these] mouse models showing antitumor effects. So that was my recollection, was that we went in different directions in terms of what we felt was the proper showing . . . ." (Id. at 203:3-17.)

Mr. Silverman also testified about the substance of conversations he had with the inventors about comparative animal data that allegedly was inconsistent with material submitted to the PTO: "[s]o my recollection was we had a discussion as to the data, the data that was available. And I believe we settled on, in terms of patentability, focusing on the pharmacokinetic profile of the compound," (id. at 189:2-9); and "I think we focused on the pharmacokinetic." (Id. at 189:15-18.)

Finally, when asked if he was provided with certain data that was alleged to show no

difference between certain prior art and the claimed compound, he testified: "I don't recall if I was or not, but if I was I certainly would have asked some questions about it . . . So, there would have been written communications . . . between myself, as an attorney, and the various people who were involved in helping us establish patentability." (Id. at 182:25-183:4.)

Mr. Silverman's testimony includes express references to communications with the same individuals listed on the privilege logs about the same issues contained in the *in camera* documents. Indeed, the Disputed Documents contain discussions regarding the same subjects disclosed in Mr. Silverman's testimony, including, among other things, preparation of a declaration submitted to the USPTO (*e.g.*, CHUGAI000013173); discussions relating to comparative data and certain prior art (*e.g.*, CHUGAI000013133, CHUGAI 000013135, CHUGAI000013139); and the decision to focus on pharmacokinetic compounds rather than mouse models (*e.g.*, CHUGAI000013093, CHUGAI000013117, CHUGAI 000013128). Moreover, on more than one occasion, Mr. Silverman refers directly to written communications and his testimony speculates as to what they might contain. These written communications appear to be the same written communications being withheld.

Accordingly, it may be strongly argued that Mr. Silverman's testimony places at issue the substance of the Disputed Documents.   See In re Human Tissue, 255 F.R.D. at 158; Aronoff, 466 F. Supp. at 862.  Fundamental fairness requires that Mr. Silverman not be permitted to offer unchecked testimony on such allegedly privileged issues, while at the same time Roche fights to keep written communications on the same issues private.  To do so

would prevent Roxane from effectively responding to assertions or implications about the substance of privileged communications, and would have the result of presenting only Roche's side of the story.  To effectively even the playing field, Roxane should have the opportunity to examine the Disputed Documents.

**4.      Additional Basis for Waiver**

Roxane has also argued that Chugai waived the privilege through the voluntary production of the Disputed Documents.  (Def.'s Br. 9.)  It is correct.

The Disputed Documents are Chugai's.  Chugai gathered the documents and, thus, must have been aware of what it was producing.  Moreover, Chugai voluntarily produced its documents without claiming privilege -- either then or now.  Thus, Chugai's production to Roxane constitutes an additional basis of waiver. [13]

**5.      Inadvertent Waiver**

Roxane argues that Roche waived any privilege that could have existed when it inadvertently produced Chugai's documents in this case.  (Def.'s Br. 14-16.)  This is a credible argument.  Yet, Roche has not responded to the argument in its brief, apparently based upon a mistaken assumption that by enforcing the claw-back provision during the February 1, 2011 conference, the Court ruled that no waiver occurred as a consequence of its "inadvertent" disclosure.  (Pl.'s Br. 22-23.)  Thus, rather than respond, Roche requests permission to brief the issue later if the Court wishes to "revisit this issue." (Pl.'s Br. 23 n.7.)

---

[13] Were there standing under the common-interest doctrine, it is possible that other arguments

During the February conference, saddled with eleventh hour boundless submissions, the Court decided to enforce the claw-back provision on a temporary basis.  (Tr. 18:11-21 "[G]iven what was shown to me, given my interpretation of claw-back provisions . . . *it's my decision at the moment* that I . . . will enforce the clawback . . . I'm not going to order that the documents . . . be produced now prior to your trip to Japan." (emphasis added)).  This is consistent with the Undersigned's view that generous enforcement of "claw-back" provisions is to be favored in our intertangled electronic discovery world, especially in cases involving large numbers of documents.  However, the ultimate issue of privilege and waiver was not decided.  And, even if it had been decided, this Court would be free to reach a different conclusion based upon a more complete record.  Christiansen v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988).  As the party bearing the burden to show the privilege has not been waived, Roche should have responded to Roxane's argument -- if it deemed it important.

When an inadvertent disclosure has occurred, privilege may be maintained if a balance of certain factors -- including reasonableness in precautions taken to prevent the disclosure in the first instance and the delay in rectifying a disclosure -- counsel against waiver.  See Ciba-Geigny Corp. v. Sandoz, 916 F. Supp. 404, 411 (D.N.J. 1996); see also Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. 480, 501-02 & n.18 (2009).  Here, it appears that Roche obtained documents from Chugai and turned them over to Roxane without any privilege review at all.  At no time has the Court has been advised of any precautions that were taken

could be made.

26

to prevent inadvertent disclosure.  Also, Roche waited more than two months after the issue of disclosure was raised by Teva before they sought a return of the documents.[14]   The Court declines to formally rule on this issue.  Yet, in the future, the parties are advised to address any substantive arguments they deem important.

*          *          *

This Court finds that Roche lacks standing to assert privilege over third-party Chugai documents it has repeatedly stated are not in their control.  In addition, even assuming there is standing, the Court finds that Roche has failed to establish that at least six (6) of the documents are privileged at all, and that any privilege that had attached to any of the documents has been waived.  However, due to the closeness and complexity of these issues, the parties should be aware that the Court deliberately took another step to make sure that the decision was fair and appropriate in the context of this case.  Specifically, the Court endeavored to step back from the esoteric points of law cited herein and observe the big picture.  In doing so, the Court notes that the Disputed Documents were in the public domain for five months.  Moreover, the particular relevance or importance of the documents has not been made clear to this Court.  In sum, the Court is satisfied that the totality of the

---

[14] Even though Roche did not brief the issue, it did address the issue in its January 20, 2011 letter submission, which was submitted when the issue was being handled informally, arguing that the Discovery Confidentiality Order would operate to preclude waiver.  (See Steensma Decl., Ex. 6, at 14.)  Roxane responded, taking the position that in order to preclude waiver, Roche was not permitted to simply rely upon the Discovery Confidentiality Order, but also obligated to address the requirements of Federal Rule of Evidence 502 and the applicable case law.  (Steensma Decl., Ex. 14 at 3-4.)  The issue is subject to debate.  See

circumstances, together with precedent, support production of the documents.

## <u>CONCLUSION</u>

For the above stated reasons, Defendant's motion to compel is **granted**, and the

Disputed Documents shall be produced.

An appropriate Order will be entered.

      s/Mark Falk             
**MARK FALK**
**United States Magistrate Judge**


**Dated:  May 11, 2011**

---

<u>U.S. v. Sensient Colors</u>, No. 07-1275, 2009 WL 2905474, at *2-3 (D.N.J. Sept. 9, 2009).